## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

**JOHN OLSON,**

                           **Plaintiff,**

**v.**                                        **MEMORANDUM OF LAW & ORDER**
                                              **Civil File No. 05-118 (MJD/AJB)**

**INTERNATIONAL BUSINESS**
**MACHINES,**

                          **Defendant.**

---

Clayton D. Halunen and Paul Egtvedt, Halunen & Associates, Counsel for Plaintiff.

Alissa M. Raddatz, Holly M. Robbins, and Jerry W. Snider, Faegre & Benson LLP, Counsel for Defendant.

---

## I.    INTRODUCTION

This case arises out of a dispute regarding Plaintiff's termination of employment. The case is currently before the Court on the Parties' cross motions for summary judgment. [Doc. Nos. 45 & 51.]  Olson seeks summary judgment on three issues.  Defendant seeks summary judgment on all counts in the complaint, dismissal of the case with prejudice, and its costs and fees associated with this litigation.  Oral argument was heard on February 15, 2006.

II.    **FACTUAL BACKGROUND**

Plaintiff Olson had worked as a project manager for Northern States Power ("NSP") for over twelve years at the time NSP outsourced its computer operations to IBM in 2000.  At that time, Olson became an employee of IBM and worked out of the NSP facilities in Minneapolis.  Olson reported to first-line manager Shelley Green, who was located in Colorado.  In turn, Green reported to second-line manager Jeff Deuell, who was also located in Colorado.  Deuell reported to third-line manager Lynnda Best-Wiss.

In December 2001, Green informed Olson that a client had asked that Olson be removed from his project because of several late deliverables.  Olson felt that his lack of success on this project was due to lack of support.  In November 2002, Olson was removed from another project because he missed several deliverables.  Olson also missed deadlines on this project.  Olson states that in spite of these situations, he was given performance bonuses in 2002 and early 2003.  (Pl. Mem. Opp. Def. Mot. Summ. J. at 5-6.)  IBM counters that Olson only received "good" ratings for his work during this time.  (Def. Mem. Opp. Pl. Mot. Summ. J. at 5 n.4.)

In December 2002, Olson's wife was diagnosed with skin cancer.  Olson informed Green of the situation and stated that he would probably "require even more flexible hours than [he] already [had]."  (Green Aff. Ex. 1.)  Green told

Olson he was eligible for FMLA leave if he needed to take time off to care for his wife.  During late 2002 and early 2003, Olson periodically requested time off because of Mrs. Olson's illnesses.  Mrs. Olson had doctor's appointments on December 16 and 31, 2002 and May 20, 2003.  Olson's time sheets reflect that he worked at least eight hours on December 16 and May 20, and took a vacation day on December 31. (Radditz Aff. Ex. 1.)  In addition to her cancer treatment, Mrs. Olson had her gallbladder removed on February 14, 2003.  Olson's time sheets indicate that he took that day off work.  Olson took time off occasionally during this time period, and worked from home some of the time.  There were days during the time Mrs. Olson was being treated when Olson both worked from home and took FMLA leave.  Mrs. Olson worked a full-time job during her cancer treatment and never took any FMLA time to deal with her cancer or her gallbladder problems. (Lori Olson Dep. at 20, 22.)

In February 2003, Green initiated a remote work program ("RWP") that allowed employees to work from home up to one day a week.  However, shortly after the RWP was implemented, Green noticed a decrease in productivity and an increase in customer complaints, and decided to suspend the program only a few months after it was started.  Discontinuation of RWP was announced at an April 22, 2003 team meeting that Olson attended via telephone.  When discontinuation of RWP was announced, Olson spoke in opposition to the decision.  Deuell found

Olson's response to the news inappropriate.  Specifically, Deuell felt that Olson kept making the same objections over and over again, even though he was given answers to his questions. (Deuell Dep. at 34-36.)  Olson felt that his comments were appropriate and professional, and asserts that Deuell "jumped down [his] throat" when he commented.  (Pl. Mem. Opp. Def. Mot. Summ. J. at 7.)  Olson later had a meeting with Green in which Green asked him how he felt about the meeting.  Olson responded that he thought when management brought up the subject of "utilization" problems (work hours), he was being singled out because management wanted to make an example out of him.  According to Olson, Green said that Olson had read the situation properly, and asked if he had "gotten the point?"  (Olson Decl. ¶¶ 5-6.)

On May 7, 2003, Olson was scheduled to attend a meeting, but was home taking care of his ill son.  Olson sent an email to two IBM project managers stating that he was home caring for a sick child and that the "management team does not allow us to work from home during business hours anymore.  I am sincerely sorry for not being able to attend this important meeting since I could have easily called in from home, but my management has taken a very strong position on this."  (Def. Mem. Supp. Mot. Summ. J. Ex. I, ex. 4.)  Deuell found this email unprofessional, and recommended that he and Green "help [Olson] find another opportunity within IBM, or outside, as he clearly lacks the maturity

4

to be in the position that he currently holds."  (Green Aff. Ex. 5.)  Green found the email sarcastic.  (Green Dep. at 128.)

During the ensuing weeks, Green noted problems with Olson's work and removed Olson from two projects.  Specifically, Green found that Olson failed to meet deliverables and failed to contact a client in a timely manner.  When Green asked Olson about his failure to contact the client, Olson sent Green an email stating, "[A]pparently Michelle [the IBM employee who informed Green that there had been no contact] doesn't read her email before blasting out at people," and told Green that he could make the client contact, but that he would then need to inform another client that it would be "second on the priority list."  (Green Aff. Ex. 6 at IBM RESP. 118.)  Steve Sande, the team lead, told Olson not to inform the other client that it would be given lower priority.  (Id. at IBM RESP. 117.) Green also found other behaviors unprofessional.  Specifically, Green felt that Olson took sole credit for the success of a project when other team members should also have been credited and Olson sent Green what she considered to be a snide email when she changed her name after her divorce.  Olson argues that during this time, Green "hound[ed] and harass[ed] him."  (Pl. Mem. Supp. Mot. Summ. J. at 6.)

On May 29, 2003, Green placed Olson on a thirty-day performance improvement plan ("PIP"), and told him that he either had to accept the plan or

5

take a severance package and leave the company.  The PIP addressed (1) Olson's failure to meet deliverables and other expectations, (2) Olson's inability to be flexible in response to customer expectations and culture, (3) Olson's inappropriate communications regarding discontinuation of the RWP, and (4) Olson's inflexibility in managing multiple projects which was disruptive to other team members. (Def. Mem. Opp. Pl. Mot. Summ. J. Ex. G at IBM RESP. 078-080.) Olson chose to accept the PIP, completed its requirements successfully, and was released from the PIP at the end of thirty days.

After the PIP expired, Green and Olson apparently met often to discuss his work performance.  Green characterizes these meetings as attempts to "assist [Olson] in sustaining the required level of job performance."  (Def. Mem. Supp. Mot. Summ. J. at 10.)  Olson characterizes these meetings as "harassment." (Id.) During this time period, Olson sought the company's help in resolving his disputes with Green on several occasions. (Olson Dep. at 276.)

By early October 2003, Olson was experiencing panic and anxiety about work.  On October 21, Olson took time off work, and two days later emailed Green and stated that he was having "serious health issues" and would be having a number of doctor's appointments over "the next week or so."  (Def. Mem. Supp. Mot. Summ. J. at 10.)  After Olson missed a week and a half of work, Green

informed him that he would have to work with IBM Global Occupational Health ("GOH") to have his absences approved.

Olson provided GOH with treatment reports signed by his primary care physician, Dr. Ronneberg, stating that Olson was suffering from depression, anxiety, and panic attacks. Olson's leave was originally approved through November 21, and was subsequently extended through December 17, 2003. During this time, Olson worked with Dr. Ronneberg, and a therapist named Jay Hunt. Hunt was helping Olson work through issues related to his relationship with Green. During the course of his therapy with Hunt, Olson confided that he had a reoccurring dream in which he confronts someone whom he believes to be an adult he had a verbal altercation with when he was a teenager. In the dream, Olson is being pursued by this man. The man has a gun and shoots at Olson. Olson finds a gun of his own and, once cornered, shoots the man repeatedly in the face, neck, and abdomen before the man falls to the ground and the dream ends. (Knudson Dep. Ex. 6.)

Hunt opined that "IBM was perhaps the pursuer and [Green was] representing IBM, at least some of the time." (Hunt Dep. at 118.) When Hunt saw Olson, Olson was having thoughts of harming Green. (Id. at 36, 40.) Hunt testified that the fact that Olson admitted these feelings might make Olson less likely to act on the thoughts, but also testified that in some cases, such talk might

7

make it more likely that someone would act on the thoughts.  (Id. at 40-41.)  Hunt

never placed any work restrictions on Olson.  (Id. at 58.)

Olson contends that during his leave of absence, Green harassed him by

telling him he had to call in every day; threatening to cut off his short term

disability benefits; and stating that due to his inability to handle stress, he no

longer met the requirements of his job and could be disciplined, and possibly

terminated.[1]  (Pl. Mem. Opp. Def. Mot. Summ. J. at 14.)  However, once Olson

provided proper documentation for his absences and extensions, Green stopped

calling.  Olson returned to work on December 18, but went home after half a day

because he was so anxious that he became ill.  Olson did not submit a proper

medical time report ("MTR") for this illness and Green twice contacted Olson and

told him that he needed to submit an MTR extending his medical leave to GOH or

his time off would be unpaid.  Olson submitted a proper MTR from Dr. Ronneberg

stating that Olson was unable to perform work of any kind because of depression,

anxiety, and panic attacks from October 2003 through February 2004.

(Ronneberg Dep. at 80-81; Ex. 2-4.)  Ronneberg opined, however, that Olson

---

[1] Olson asserts that two of his fellow employees, Steven Sande and Terri Ponder,
also developed anxiety symptoms due to the way Green treated them.  (Pl. Mem.
Opp. Def. Mot. Summ. J. Egtvedt Aff. Ex. TT, UU.)  At oral argument, IBM
challenged this assertion and proffered that Ponder voluntarily left the company
and Sande was terminated for saying unflattering things about an IBM client in a
blog posting.

would only be unable to perform any work until he was stabilized on his medications.  Olson was excused from work and was paid through February 2004.

In January 2004, IBM asked Olson to provide a report from a licensed psychiatrist of his own choosing.  Olson provided an MRT and a psychiatric impairment report from Dr. Keith Hartman.  The MRT stated that Olson had an adjustment disorder with anxiety, but not depression.  (Hartman Dep. Ex. 3 at JO MR 02 03-04.)  The psychiatric impairment report found Olson only mildly impaired in his ability to sleep and moderately impaired in his ability to adapt to limits or standards and in his ability to manage conflicts with others.  (Id. at JO MR 0322.)  There was no impairment in any of the twenty-one other categories addressed by the report, including Olson's "ability to perform daily tasks (including work) [he] performed prior to the . . . illness."  (Id.)  Dr. Hartman also found that Olson was "fully engaged in his community, he was enjoying his marriage, his child, he did not have precipitant mood swings during the daytime, his concentration was good, when he was not at work at least.  Appetite was normal, weight was normal."  (Hartman Dep. at 39.)  Dr. Hartman's office notes indicate that Olson's goal during this time period was to return to work.  Dr. Hartman suggested that Olson could return to work at his current job if IBM put forth "a modicum of effort" and either transferred Olson to a different supervisor or mediated the situation between Olson and Green.  (Id. Ex. 3 at JO MR 02 04.)

9

Dr. Hartman found that Olson could work at any other job, even a job within IBM, without accommodation.  (Hartman Dep. at 40, 48, 73.)

Cathy West, a nurse at GOH, found the conclusions regarding Olson contradictory, and discussed her concerns with Dr. JoAnne Pizzino, an IBM contract employee.  The two decided that Olson should have an independent medical examination ("IME").  IBM asked Dr. Dean Knudson, a board certified psychiatrist, to conduct the IME, and instructed Dr. Knudson to address the following in his assessment: (1) Olson's medical history; (2) Olson's prognosis, including "recommendations on how to improve the prognosis, hasten recovery, or modify treatment which would diminish the disability;" (3) Olson's ability to work, including whether he could return to his regular job and when, and if he could return to "modified duty" (noting that "IBM can usually make appropriate and reasonable workplace modifications"); (4) Olson's Global Assessment of Functioning and Axis V; (5) Olson's risk of violence to himself or others; and (6) the results of all psychological tests Dr. Knudson conducted.  (Knudson Dep. Ex. 3 at 01 07 030-031.)  Dr. Knudson was also cautioned that it was "of fundamental importance that your [IME] of this employee be completely independent."  (Id. at 01 07 030.)

Dr. Knudson conducted the IME on April 4, 2004, and concluded that Olson was capable of work, and indeed was actively looking for similar project manager

work; and that he was "relatively symptom free with regard to depressive symptoms and panic disorder symptoms." (Id. at 01 07 016.)  Dr. Knudson stated that Olson was ready to return to work, and that it would be best for him to seek employment with a different company, but opined that Olson could return to IBM if he could "accept criticism and job improvement suggestions from immediate supervisors." (Id.)  During the exam, Olson confided to Dr. Knudson that he had "some problems with depressed mood but that by in [sic] large, his depressed mood was in good control," and that he "felt that he was well qualified to seek alternative work," but did not believe he could work at IBM anymore.  (Id. at 01 07 012-013.)

> Dr. Knudson also explained the following in his report:

> Mr. Olson has had strong thoughts of shooting and killing his immediate supervisor.  If he were to develop episodes of anger again, it is possible that he could have those thoughts again and this might represent a danger to IBM workers.  Mr. Olson, unfortunately, is at some risk of harming others due to the degree of anger that he has had in the past. . . .  I note that he owns a 45-caliber handgun for the purpose of target shooting.

(Id. at 01 07 017.)  Dr. Knudson reported that during his examination, Olson told Dr. Knudson that he had mentioned these thoughts to Jay Hunt and that Olson also told Hunt that he had the skills necessary to find Green's address.  Olson had not mentioned these thoughts to Dr. Hartman.

Olson avers that he never actually talked about harming Green when he was with Knudson, but rather only discussed the same dream he had discussed with Hunt.  During his deposition, Dr. Knudson stated that he has no independent recollection of his examination of Olson, and that he can only rely on his written report to verify his conclusions and impressions.

Green changed her parking spot in reaction to the information from Dr. Knudson, but did not change any other behaviors.  IBM did not call the police to report that Olson posed any kind of threat.

IBM has a zero tolerance policy regarding workplace threats, so upon receiving this report, West assembled a violence assessment team consisting of West, Green, Dr. Pizzino, Deuell, H.R. representative Sue Urling, IBM security consultant Michael Lawyer, and a representative from the IBM legal department.

Emails were exchanged between the team members concerning the situation.  Lawyer commented that he found Dr. Knudson's evaluation contradictory because someone cannot be ready to come back to work and be a threat at the same time.  (West Dep. Ex. 10 at 01 03 493.)  Lawyer noted that "everyone is eager to get [Olson] off the books," but told IBM human resources representative Russell Mandel that everyone needed to "slow down from separating [Olson] – at least until we can get another psych eval [sic] with all the facts on the table."  (Id. at 01 03490.)

12

On April 30, 2004, Dr. Knudson wrote West a second letter stating that Olson's violent ideation was directed toward a specific IBM employee, not at IBM in general; that Olson now felt in good control of his violent impulses; and that Olson's presentation was inconsistent with that of someone who would at the present time be capable of stalking or an abrupt violent outburst.  (Def. Mem. Supp. Mot. Summ. J. Egtvedt Aff. Ex. J at 01 07 006.)   However, Dr. Knudson also opined that Olson "had harbored violent thoughts in the past and, as such, is more likely than individuals in the general population to have violent impulses in the future, by nature of his temperament and personality style."  (Id.)

The violence assessment team determined that Olson could not return to work for Green because doing so could endanger Green's life.  Olson was terminated on June 18, 2004, and was given the opportunity to accept a severance package in exchange for a release.  Olson declined the severance offer. Olson was paid for all of his time off from October 2003 through his termination.

Russell Mandel testified that he has been an IBM human resources employee for over thirty years, and that he had been involved in two other situations in which employees made verbal threats against another employee or contractor.  (Mandel Dep. at 63-72.)  In both those situations, violence assessment teams were convened and Mandel believed that upon learning of the threats, the employees' supervisors spoke to the allegedly threatening employees before

13

making the decision to terminate them.  (Id. at 67, 71.)  Both of those employees were terminated after these discussions.

Olson did not return his IBM-issued laptop computer when he was terminated.  On May 20, 2005, Holly M. Robbins, IBM's counsel, requested that Olson return the laptop, and instructed him not to remove or destroy any information on the computer or make any changes to the computer.  Olson stated that he did not remember removing any information from the hard drive during the last six months he was employed by IBM or after his termination.  Robbins received the laptop on May 31, and sent it to LuciData so that the information in the hard drive could be reviewed.  LuciData tried several techniques to recover the information in the hard drive, but was unable to do so.  Since IBM could not retrieve the information in the hard drive, it served Olson an interrogatory asking whether he had altered, changed, damaged, or tampered with any information in the hard drive.  Olson responded that he may have cleaned up information in the hard drive so the computer would be ready for a new user, but that he did not remember what any of the deleted information would have been, other than old project data.  After several weeks, LuciData was able to access the hard drive and recover the names of the files contained in the hard drive, but not the content of the files.  Several files had names that indicated that they might contain sexually explicit material.  LuciData was able to look at some of the JPEG files found on

the laptap, and noted that one was a pornographic website, but could not determine where it came from.  (Wunsch Dep. at 34-36.)

IBM's Business Conduct Guidelines provide, in pertinent part, that "[i]t is inappropriate to use IBM systems to visit Internet sites that feature sexual content, gambling, or that advocate intolerance of others."  (Radditz Aff. Ex. 4 at 01 11 078.)  Any violation of this policy "can result in disciplinary action, including dismissal." (Id. at 01 11 075.)

During his deposition, Olson admitted that he had in fact deleted information from the laptop after he had been terminated from IBM.  Olson also testified that several people used the laptop, including his son and his son's friends, and that his wife and other relatives had access to the laptop and may have used it.  (Olson Dep. at 313-14.)  Mrs. Olson testified that neither she nor her son touched the laptop.  (Lori Olson Dep. at 62.)

## III.   DISCUSSION

### A.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed

issue of material fact.  Id. at 323.  Summary judgment must be granted when the opposing party fails to make a showing that supports the existence of an element essential to the case and on which the opposing party bears the burden of proof at trial.  Id. at 332-33.  Summary judgment should seldom be used in employment discrimination cases.  Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.    IBM's Motion for Summary Judgment

IBM argues that it is entitled to summary judgment on all of Olson's claims, and that the case should be dismissed.  IBM also seeks its costs and fees associated with litigating this matter.

### 1.    MHRA Disability Discrimination Claim

Count II of the complaint asserts a claim for disability discrimination in violation of the MHRA.  MHRA disability discrimination claims are  analyzed under the McDonnell Douglas burden shifting analysis.  See Hoover v. Norwest Priv. Mortg. Banking, 632 N.W.2d 534, 542 (Minn. 2001).  Under McDonnell Douglas, the plaintiff bears the initial burden of proving a prima facie case of discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  The defendant then has the burden to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  Id.  Finally, to prevail, the plaintiff must show that the defendant's proffered reason was a pretext for discrimination.

Id. at 804.  Federal precedent may be used to construe the MHRA.  See Reiff v. Interim Personnel, Inc., 906 F. Supp. 1280, 1292 (D. Minn. 1995) (citations omitted).

### a.    Prima Facie Case

To prove a prima facie case of employment discrimination under the MHRA, a plaintiff must prove (1) that he has a disability within the meaning of the MHRA; (2) that he is qualified to perform the essential functions of his job, with or without reasonable accommodation; and (3) that he suffered an adverse employment action because of his disability.  See Burchett v. Target Corp., 340 F.3d 510, 516 (8th Cir. 2003).

Olson argues that he was discriminated against in violation of the MHRA because IBM did not accommodate his disability; failed to restore him to his original job after leave; subjected him to harassment and unreasonable demands; subjected him to an unnecessary psychological examination and testing; altered the terms and conditions of his employment; and finally terminated him because of his disability.

### 1.    Whether Olson is Disabled

### AA.   Legal Standards

The Minnesota Human Rights Act ("MHRA") provides that "[e]xcept when based on a bona fide occupational qualification, it is an unfair employment

practice for an employer, because of . . . disability . . . to . . . discharge an employee or discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn. Stat. § 363A.08(2)(c).

"'Disability' means any condition or characteristic that renders a person a disabled person. A disabled person is any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Minn. Stat. § 363A.03 subd. 12. Under the MHRA, working is a major life activity. Sigurdson v. Carl Bolander & Sons, Co., 532 N.W.2d 225, 228 (Minn. 1995).

Merely having an impairment does not make someone disabled. See Hoover v. Norwest Private Mortg. Bank, Nos. A03-1347, A03-1796, 2004 WL 1328057, at *3 (Minn. Ct. App. June 9, 2004) (citing Toyota Motor Mfg. v. Williams, 534 U.S. 184, 195 (2002)) (unpublished opinion). Moreover, an impairment corrected by medication or other measures does not substantially limit a major life activity. Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83 (1999). Similarly, being unable to work while recuperating or recovering from an illness does not make someone disabled. Heintzelman v. Runyon, 120 F.3d 143, 145 (8th Cir. 1997) (holding that under the ADA, a documented inability to work

18

while recovering from surgery was not evidence of a permanent impairment that substantially limited the life activity of working); Ross v. City of New Brighton, No. C3-98-1095, 1998 WL 764414, at *1 (Minn. Ct. App. Nov. 3, 1998) (unpublished opinion) (holding that one year work restriction while recovering from a back injury did not establish a record of disability under the MHRA).

In order to be materially impaired in the major life activity of working, a person must be restricted from performing a "class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." Rojina v. City of Chanhassen, No. C7-02-5, 2002 WL 1461815, at *2 (Minn. Ct. App. July 9, 2002) (unpublished opinion) (citations omitted). Therefore, the inability to perform a single job is not a substantial limitation in the major life activity of working. See Kellogg v. Union Pac. R.R., 233 F.3d 1083, 1087 (8th Cir. 2000). Likewise, a person does not establish a record of disability merely by being unable to work for a specific supervisor. See Greer v. Emerson Elec. Co., 185 F.3d 917, 921 (8th Cir. 1999) (holding that plaintiff was not disabled under the ADA when plaintiff's severe depression was aggravated by supervisor's conduct rendering plaintiff unable to work with supervisor); 29 C.F.R. § 1630.2(j)(3)(i) (stating that under the ADA, the inability to work for a specific supervisor does not constitute a substantial limitation in the major life activity of working).

When a plaintiff alleges that work is the major life activity in which he is materially impaired, the court must consider the following: "(a) the number and types of jobs from which the impaired individual is disqualified, (b) the geographic area to which the applicant has reasonable access, (c) the applicant's own job expectations and training, (d) the criteria or qualifications in use generally, and (e) the types of jobs to which the rejection would apply." Hoover, 632 N.W.2d at 543 (quoting State by Cooper v. Hennepin Cty., 441 N.W.2d 106, 111 (Minn. 1989)).  Failure to establish a prima facie case when considering these factors should result in dismissal of the plaintiff's case.  Hoover, 2004 WL 1328057 at *4.

> **BB.** **Whether Olson is Substantially Limited in the Major Life Activity of Working or Was Regarded as Substantially Limited in the Major Life Activity of Working**

Olson argues that he is disabled because of his depression and anxiety. Specifically, Olson claims that he is unable to perform either a class of jobs or a broad range of jobs because Dr. Ronneberg concluded that Olson was unable to work at any job from October 2003 through February 2004.  Therefore, according to Olson, there is a record of his disability that satisfies the standards of the MHRA.  Moreover, Olson argues that he is disabled because Dr. Ronneberg concluded that he could not return to work at IBM without the accommodation of

either a mediated agreement between he and Green or a transfer to a position with a different supervisor.  Thus, according to Olson, he is limited in the major life activity of working.

Looking at the facts in the light most favorable to Olson, Olson is not limited in the major life activity of working for several reasons.  First, in order for Olson to be limited in the major life activity of working, Olson must be disqualified from performing a whole class of jobs, not just one certain job.  See Kellogg, 233 F.3d at 1087; Rojina, 2002 WL 1461815, at *2.  The undisputed evidence is that if Olson is disqualified from working at all, he is only disqualified from working for Green.  Olson, himself, stated that he is well-qualified for work and was actively seeking similar employment at the time he saw Dr. Knudson.  Dr. Hartman found that Olson could work at any other job, even a job at IBM.  Dr. Knudson concluded that Olson could even work at IBM if he could learn to take constructive criticism.  Dr. Ronneberg stated that the goal of the medication therapy was to get Olson back to work, and therapist Jay Hunt concluded that Olson was able to work with a different supervisor.  This precludes a finding that Olson was unable to perform an entire class of jobs.

Second, the fact that Olson was unable to work for five months does not establish a record of disability under the MHRA.  Ross, 1998 WL 764414 at *1.  The record demonstrates that Olson was ready to return to work in April 2004.  In

21

fact, Olson was actively seeking other employment at that time.   There is no evidence in the record to indicate that Olson's period of inability to work lasted beyond five months.

Third, Olson's disability must be considered in its treated state.   <u>See</u> <u>Sutton</u>, 527 U.S. at 472-73.   As discussed above, all the evidence indicates that Olson's depression and anxiety are controlled with medication, which the Court assumes Olson is still taking.   During his interview with Dr. Knudson, Olson admitted that his depressed mood was generally in good control and that he was relatively symptom free.   Moreover, Dr. Ronneberg stated that Olson would only be unable to work until he was stabilized with his medication, a limitation that ended in February 2004.   There is no evidence to support the conclusion that Olson's conditions are not well controlled with medication.

Fourth, Olson's inability to work for Green does not establish that he is disabled.   <u>See</u> <u>Greer</u>, 185 F.3d at 921.   In <u>Greer v. Emerson Elec. Co.</u>, the plaintiff, who suffered from depression, was discharged for excessive absenteeism.   185 F.3d at 919.   The plaintiff's supervisor admitted to directing vulgarities at plaintiff during her employment.   <u>Id.</u> at 920 n.8.   After being discharged, the plaintiff filed suit claiming that she had been terminated in violation of the ADA.   <u>Id.</u> at 920.   Specifically, the plaintiff argued that "'but for the conduct of [her supervisor] toward her, her prior disability, severe depression, would not have been

22

aggravated,' which contributed to her excessive absences, ultimate discharge, and present condition of total disability." Id. at 921.  The Eighth Circuit disagreed and found that even assuming the plaintiff's condition made her unable to work with that supervisor, it did not mean the plaintiff was limited in the major life activity of working because the inability to perform a single job does not constitute such a limitation.  Id.  See also Palmer v. Cir. Ct. of Cook Cty., Ill., 117 F.3d 351, 352 (7th Cir. 1997) (stating that even if a conflict with a supervisor produces anxiety and depression, "as such conflicts often do," it does not establish a disability).

Olson's situation is similar to the plaintiff's situation in Greer.  Olson suffered from depression and claims that Green's conduct exacerbated or even caused his illness.  However, Olson admits he can work for a different supervisor or at a different job.  In fact, Olson was seeking other employment at the time of his discharge.

Moreover, the record demonstrates that (a) the number and types of jobs from which Olson is disqualified is one, at most – a job working for Green; (b) the geographic area to which Olson has reasonable access is large – he commuted from Northbranch to Minneapolis to work, so at least the entire northern metropolitan area is at his access; (c) Olson's own job expectations and training qualify Olson for other jobs – he, in fact, was seeking other project manager jobs at the time of his termination and stated that felt he was qualified to seek other

23

work; and (d and e) the only criteria, qualification, or types of job that would preclude employment based on the evidence or to which a rejection would apply would be jobs working for Green. Thus Olson has failed to prove that he is disabled under the MHRA.

However, that does not end the Court's inquiry. The Court must now assess whether IBM regarded Olson as disabled.

The fact that IBM knew Olson suffered from depression, anxiety, and panic attacks, without more, is not enough to establish that IBM regarded Olson as disabled. In order to establish that Olson was "regarded" as a person with a disability, Olson must prove that IBM (1) believed that Olson had an impairment that limited one or more major life activities; or (2) believed that an actual nonlimiting impairment substantially limited one or more major life activity. See Sutten, 527 U.S. at 488-89; Brunko v. Mercy Hosp., 260 F.3d 939, 942 (8th Cir. 2001). To demonstrate that IBM regarded Olson as disabled, Olson must "do more than allege that he is regarded as having an impairment which prevents him from working at a particular job. [Olson] must demonstrate that he is regarded as precluded from a substantial class of jobs." Shipley v. City of Universal City, 195 F.3d 1020, 1023 (8th Cir. 1999) (citations omitted).

Looking at the facts in the light most favorable to Olson, a fact issue exists as to whether IBM regarded Olson as disabled. When IBM ordered the IME, it

24

asked Dr. Knudson to make "recommendations on how to improve the prognosis, hasten recovery, or modify treatment which would diminish the <u>disability</u>." (Knudson Dep. Ex. E, ex. 3 at 0107 030) (emphasis added).  Moreover, Olson testified in his deposition that Green told him that because of his condition and inability to handle stress, he no longer met the requirements of his job. Therefore, there is a fact issue as to whether Green thought Olson was disabled, and therefore unable to perform a class of stressful jobs.

Thus, although Olson is not disabled under the MHRA, a fact issue exists as to whether IBM considered him disabled.  Accordingly, the Court must move on to the next step in the analysis.

### CC.  <u>Whether Olson Was Qualified to Work at IBM</u>

The determination of whether an employee is qualified to perform the essential functions of a job involves a two step inquiry.  <u>Burchett</u>, 340 F.3d at 517. First, "the employee must show that [he] meets the necessary prerequisites for the job, and then [he] must demonstrate that [he] can perform the essential functions, with or without reasonable accommodation."  <u>Id</u>.  If the employee demonstrates that he cannot perform the essential functions of the job without accommodation, he must then make a facial showing that a reasonable accommodation is possible and that the reasonable accommodation will allow him to perform the job.  <u>Id.</u>  If the requested accommodation is a transfer, he must

25

also demonstrate that he cannot be accommodated in his current job in any other way because reassignment is "an accommodation of last resort." Id. at 518 (citation omitted). See also Cravens v. Blue Cross & Blue Shield of Kan. City, 214 F.3d 1011, 1018 (8th Cir. 2000) ("The ADA plainly states that re-assignment may be required to reasonably accommodate a worker with a disability") (quotation omitted).

Courts have found that employees who threaten other employees or pose a danger to other employees are not qualified for their jobs. See Chapa v. Adams, 168 F.3d 1036, 1039 (7th Cir. 1999) (finding that under the Rehabilitation Act, an employee is not qualified for his job when he presents an actual or perceived risk of violence); Palmer, 117 F.3d at 352  (finding that "the [ADA] does not require an employer to retain a potentially violent employee" and that an employee who threatens other employees is not a "qualified employee"); Husowitz v. Runyon, 942 F. Supp. 822, 834 (E.D.N.Y. 1996) (finding that an employee who threatened to copy an act of violence was not qualified for his job within the meaning of the Rehabilitation Act).  This is true even when the threat is only based on an employee's statement to a doctor that is then later reported to the employer.  See Vargas v. Gromko, 977 F. Supp. 996, 1002-03 (N.D. Cal. 1997) (finding that threat was real when employee told his doctor that if he had owned

a gun, he would have shot his supervisors for discriminating against him, and the doctor then reported the statement to the employer and the police).

Looking at the facts in the light most favorable to Olson, a fact question exists as to whether Olson was qualified for his position at IBM. There is conflicting evidence regarding whether Olson meets the necessary prerequisites for his job. IBM argues that Olson had trouble getting along with co-workers, trouble taking constructive criticism and direction, and trouble meeting deadlines. However, IBM does not dispute that Olson was given at least decent performance reviews during the relevant time period. This conflicting evidence creates a fact issue regarding Olson's ability to perform the duties of his job. As for IBM's assertion that dangerous employees are not qualified to work at IBM, the Court must take a jaundiced view of Dr. Knudsen's conclusion that Olson is a threat to Green. In his follow up letter, Dr. Knudson himself seems to equivocate on this issue. As security specialist Lawyer opined: how can someone be ready to come back to work and be a threat at the same time? (West Dep. Ex. 10 at 01 03 493.)

Moreover, there is a fact question as to whether Olson needs an accommodation to perform his job and if so, whether the accommodation is reasonable. Although transfers are sometimes reasonable, they are still the accommodations of last resort. There is currently no evidence regarding whether other positions were available within IBM that Olson could fill, or whether a

27

transfer would create a burden for IBM.  <u>See</u> <u>Cravens</u>, 214 F.3d at 1020 (stating

that under the ADA, reassignment is not necessary if it causes the employer an

undue hardship).

### iii.   <u>Adverse Employment Action</u>

It is undisputed that termination was an adverse employment action.

### iv.   <u>Fact Issues Remain</u>

Since fact issues remain as to whether Olson has proven his prima facie

case, the Court will move onto the next step of the analysis.

### b.  <u>Legal Nondiscriminatory Reason for Olson's Termination</u>

IBM argues that terminating Olson because he was a potential threat to

Green or other IBM employees was a legitimate nondiscriminatory reason for the

termination.  The Eighth Circuit has found that terminating someone for being a

perceived threat to other employees is legitimate.  <u>See</u> <u>Johnson v. AT&T Corp.</u>,

422 F.3d 756, 763 (8th Cir. 2005) (termination based on employer's belief that

employee had made bomb threats against the worksite); <u>Clark v. Runyon</u>, 218

F.3d 915, 919 (8th Cir. 2000) ("Both actual violence against fellow employees

and threats of violence are legitimate reasons for terminating an employee");

<u>Blanton v. Prestolite Wire Corp.</u>¸ 208 F.3d 217 (8th Cir. 2000) (unpublished table

decision) (termination based on threats and incident of brandishing a gun during

session with worker's compensation doctor was legitimate).  The Court finds that

28

IBM has stated a legitimate nondiscriminatory reason for terminating Olson.  The Court will move on to the next step of the analysis.

**c.   <u>Pretext</u>**

Evidence of pretext and discrimination are viewed in the light most favorable to the employer.  <u>Camp v. Soo Line R.R. Co.</u>, No. CIV. 01-1598 (JRT/FLN), 2003 WL 544939, at *6 (D. Minn. Feb. 20, 2003) (citation omitted).  When conducting a pretext analysis, the proper inquiry is not whether the employer was correct in its belief that an employee engaged in dangerous behaviors, but whether the employer honestly believed that the employee engaged in dangerous behaviors.  <u>Johnson</u>, 422 F.3d at 762.

Olson argues that IBM's decision to terminate him was pretextual and that IBM influenced Dr. Knudson into finding him dangerous because it asked Dr. Knudson if Olson was a threat to himself or others.  IBM responds that since it reasonably believed that Olson posed a threat to Green, terminating Olson was not pretextual.

The Court does not find that IBM's list of questions influenced Dr. Knudson to find Olson dangerous.  The offending question was just one of the many things IBM wanted addressed, and the request was stated in a non-suggestive manner.  Moreover, IBM's list of criteria for Dr. Knudson to address was IBM's standard list of IME questions, not something prepared specifically for Olson's examination.

(West Dep. at 69-70.)  Dr. Knudson testified that most employers submit questions they want answered during IMEs, and although questions about employees being threats to themselves or others are "probably not typical," he had seen this question before.  (Knudson Dep. at 21-22.)

Looking at IBM's decision in the light most favorable to IBM, the Court finds that a fact question exists regarding whether IBM's proffered excuse for terminating Olson was pretextual.  IBM's failure to interview Olson after receiving Dr. Knudson's report is troubling.  This failure to follow company policy, or at least company custom, creates a fact question regarding pretext, especially since IBM security specialist Lawyer acknowledged that IBM was "eager to get [Olson] off the books."  Lawyer himself suggested that the violence assessment team get Olson's side of the story before terminating him.

Looking at these facts, the Court cannot find that IBM is entitled to judgment as a matter of law.  A reasonable juror could conclude that IBM was looking for an excuse to terminate Olson.  Therefore, fact issues remain regarding whether IBM's stated reason for terminating Olson was pretextual.

In conclusion, although Olson is not disabled under the MHRA, fact issues remain as to whether IBM regarded Olson as disabled and whether Olson has proven his prima facie case.  Fact issues also remain as to whether Olson is qualified for his job at IBM, with or without reasonable accommodation; whether

transfer is a reasonable accommodation in this instance; and whether IBM's stated reason for terminating Olson was pretextual.  Therefore, this part of IBM's motion is denied.

### 2.  MHRA Reprisal Claim

Count III of the complaint asserts a claim of reprisal discrimination under the MHRA.  Specifically, the complaint states that Olson was "retaliated against . . . after he complained of the unfair discriminatory treatment by Mrs. Green." (Compl. ¶ 37.)  Under the MHRA, an employer is prohibited from retaliating against an employee who "opposed a practice forbidden under this chapter." Minn. Stat. § 363A.15(1).  To state a prima facie case of reprisal under the MHRA, Olson must establish that he engaged in a protected activity, suffered an adverse employment action, and that there is a causal connection between the two.  Heisler v. Metro. Council, 339 F.3d 622, 632 n.6 (8th Cir. 2003).  Opposing an act of discrimination made unlawful by the MHRA is a protected activity. Miller v. Conseco Fin. Serv. Corp., No. 01-CV-757 (DWF/AJB), 2002 WL 1495217, at *8 (D. Minn. July 11, 2002) (unpublished opinion) (citations omitted); Wentz v. Maryland Cas. Co., 869 F.2d 1153, 1155 (8th Cir. 1989) (holding that protected activity under the ADEA "includes opposing ongoing discriminatory treatment").

Olson argues that he complained of harassment, IBM did nothing, and Olson was ultimately terminated by his harasser.  (Pl. Mem. Opp. Def. Mot. Summ. J. at 32.)  To support this argument, Olson cites his deposition wherein he stated that he made reports to supervisors, human resources, and the IBM ethics hotline about Green's harassment regarding time he took off to care for his wife. (Id. at 10 n.10 (citing Olson Dep. at 278).)

Olson has failed to establish a prima facie case of reprisal under the MHRA. The cited deposition testimony refers to Olson's complaints about Green's treatment of him in connection with taking leave to care for his wife.  (Olson Dep. at 275-78.)  The MHRA does not protect someone who is trying to exercise his FMLA rights.  If anything, this testimony refers to a retaliation claim under the FMLA, a claim that will be addressed below.

Therefore, Olson has failed to state a retaliation claim under the MHRA. This part of IBM's motion is granted, and Count III of the complaint is dismissed.

### 3.    **Olson's FMLA Claims**

The Family Medical Leave Act of 1993 ("FMLA") was enacted to allow employees to take reasonable leave for medical reasons.  29 U.S.C.A. § 2601. Under the FMLA, an eligible employee is entitled to a total of twelve weeks unpaid leave during any twelve month period because of his own or his spouse's

serious health condition that makes the employee unable to perform the functions of his job.

Olson pled both interference and retaliation claims under the FMLA. However, since Olson only discusses his retaliation claim in his brief, and since Olson did not respond when IBM stated that Olson seemed to have abandoned his interference claim, the Court concludes that the interference claim has been abandoned, and the claim is dismissed. The Court will now address Olson's retaliation claim.

It is illegal for an employer to retaliate against an employee who exercises his rights under the FMLA. 29 U.S.C. § 2615(a)(2). An employee can prove FMLA retaliation using the same McDonnell Douglas burden-shifting analysis used to analyze MHRA claims. To establish a prima facie case of retaliation, the employee must show that (1) he engaged in an activity that is protected under the FMLA; (2) he suffered an adverse employment action; and (3) there is a causal connection between his action and the adverse employment action. Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002). The burden then shifts to the employer to state a legitimate, nondiscriminatory reason for its treatment of the employee, and the employee must then point to some evidence that the employer's proffered reason is pretextual. Id.

To demonstrate a causal connection, the employee must show that a retaliatory motive influenced the adverse employment action.  <u>Kipp v. Missouri Hw'y & Transp. Comm'n</u>, 280 F.3d 893, 897 (8th Cir. 2000).  A pattern of adverse actions after the employee engaged in the protected activity can also satisfy the causation requirement.  <u>See</u> <u>Bassett v. City of Minneapolis</u>, 211 F.3d 1097, 1105-06 (8th Cir. 2000).

Any employer who violates the FMLA shall be liable for damages equal to the amount of "any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation;" or "for such equitable relief as may be appropriate, including employment, reinstatement, and promotion."  29 U.S.C. § 2617.  However, the FMLA "provides no relief unless the employee has been prejudiced by the violation."  <u>Rodgers v. City of Des Moines</u>, No 05-1810, 2006 U.S. App. LEXIS 1759, at *14 (8th Cir. Jan. 25, 2006) (citing <u>Ragsdale v. Wolverine World Wide, Inc.</u>, 535 U.S. 81, 89 (2002)) (unpublished opinion).  Rather, remedies must be tailored to the harm actually suffered.  <u>Id.</u>

As discussed above, Olson argues that he was given extra work and was subjected to certain discipline, including being put on a PIP, in retaliation for taking time off to care for his wife.  Looking at the facts in the light most favorable to Olson, the Court finds that Olson has created a fact issue as to whether IBM's adverse actions during this time were in retaliation for his

exercising FMLA leave.  Although Olson did not take many full days off work, he did exercise the option to work from home and to work a flexible schedule during this time period.  Olson stated under oath that Green told him the subject of "utilization" and the discontinuation of the RWP was an attempt to single out Olson and make an example of him.

Notwithstanding the above, the Court finds that Olson did not incur any pecuniary loss during this time.  It is undisputed that Olson received eight months of <u>paid</u> leave during the time he and his wife were ill.  Therefore, Olson was given much more time off than the FMLA requires and is not entitled to damages on this account.  <u>See</u> <u>Rodgers</u>, 2006 U.S. App. LEXIS 1759, at *14 (finding that when employee actually received all the FMLA time off she requested, she was not entitled to relief).

However, Olson has created a fact issue as to whether his eventual termination was at least partially in retaliation for his taking time off to care for his wife.  As discussed above, Lawyer stated that IBM wished to get Olson off the books and the email exchanges between members of the violence assessment team could indicate that IBM may have wanted to terminate Olson prior to learning of the threat from Dr. Knudson.  Although a time lapse of eight months would be fatal to Olson's claim if he were basing his prima facie case on temporal connection alone, <u>see</u> <u>St. Hilaire v. Minco Prods., Inc.</u>, 288 F. Supp. 2d 999, 1009

35

(D. Minn. 2001), a causal connection can be established by showing that an employer's "retaliatory motive played a part in the adverse employment action." Kipp, 280 F.3d at 897.

When faced with evidence that at least one member of the violence assessment team thought that IBM wanted to get Olson off the books, the Court cannot conclude that there is no issue regarding whether retaliatory motive played a part in Olson's termination. Thus, there exists a fact question as to whether there was a causal connection between Olson taking FMLA leave to care for his wife and his termination. The Court has already found that IBM has proffered a legitimate nondiscriminatory reason for terminating Olson, and that a fact issue exists as to whether that reason was pretextual. Accordingly, this part of IBM's motion is denied

### 4. <u>Intentional Infliction of Emotional Distress</u>

Count IV of the complaint is a claim for damages for intentional infliction of emotional distress ("IIED"). A plaintiff must prove the following to recover on a claim of intentional infliction of emotional distress:

(1)   He was subjected to extreme and outrageous conduct;
(2)   The conduct was intentional or reckless;
(3)   The conduct caused his emotional distress; and
(4)   The emotional distress was severe.

Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 438-39 (Minn. 1983). The tort is limited to cases involving conduct that is "so atrocious that it passes the

36

boundaries of decency and is utterly intolerable to the civilized community" and "no reasonable person could be expected to endure it." Id. at 439

IBM's conduct does not reach the necessary high standard. Even taking the most extreme allegations – that Green called and harassed Olson while on leave and told him he was no longer qualified for his job because he was sick, and that IBM somehow conspired to make Olson fail – as true, the standard is not met. The tort of IIED is not intended to redress every work place wrong encountered by employees. See Heimbach v. Riedman Corp., 175 F. Supp. 2d 1167, 1179 (D. Minn. 2001). While Olson's allegations, taken as true for purposes of this motion, are disturbing, they do not meet the level of conduct the courts have recognized.

Furthermore, even if the Court did find IBM's conduct outrageous, Olson has not proven that his emotional distress was so severe that no reasonable person could be expected to endure it. The courts have repeatedly stated that injuries such as Olson's do not meet this standard. See Peterson v. City of Plymouth, 945 F.2d 1416, 1421 (8th Cir. 1991) (damages insufficient to make out IIED claim when conduct caused illness, sleeplessness, anxiety, mental anguish, loss of reputation, and marital problems); Hubbard, 330 N.W.2d at 440 (damages insufficient to make out IIED claim when conduct caused depression, stomach disorders, rash, and high blood pressure); Elstom v. ISD No. 270, 533 N.W.2d 51, 57 (Minn. Ct. App. 1995) (damages insufficient to make out IIED claim when

37

conduct caused insomnia, crying spells, fear of answering door and phone, and depression requiring treatment); <u>Odegard v. Finne</u>, 500 N.W.2d 140, 144 (Minn. Ct. App. 1993) (damages insufficient to make out IIED claim when conduct caused depression requiring medication, impairment of ability to trust, and damaged relationships with children).  Olson's injuries are not any more severe than the injuries cited in the above cases, and Olson's claim for IIED fails. This part of IBM's motion is granted.

### 5.    <u>IBM's Request for Costs and Fees</u>

IBM's request for costs and fees is denied.

### B.    <u>Olson's Motion for Summary Judgment</u>

Olson seeks summary judgment on the following three issues: (1) that Olson's wife had a serious health condition that entitled him to take FMLA leave; (2) that Olson suffered from a disability under the MHRA; and (3) that IBM can prove no set of facts under which it could prevail under its defense of after-acquired evidence.[2]

---

[2] IBM argues that the first two issues are not properly before the Court since they do not address entire claims.  Since the issues are moot, the Court need not decide if they are properly before it.

### 1.   Whether Mrs. Olson Suffered From a Serious Health Condition That Entitled Olson to take FMLA Leave

Olson argues that his wife's skin cancer was a condition that entitled Olson to take FMLA leave.  IBM does not dispute this.  Thus, this part of Olson's motion is denied as moot.

### 2.   Whether Olson is Disabled Under the MHRA

This issue was addressed in the context of IBM's motion.  Accordingly, this part of Olson's motion is also denied as moot.

### 3.   Whether the Court Should Strike IBM's After-Acquired Evidence Defense

IBM learned about the seemingly pornographic materials on Olson's laptop after Olson was terminated, and only learned during discovery that Olson actually cleaned out the hard drive after being told not do so.  IBM argues that had it known Olson was viewing pornography on his IBM computer, it would have terminated Olson even if he did not make threats against Green.  IBM also argues that Olson's deliberate erasing of his hard drive after being told not to do so amounts to spoliation of evidence, a claim that could result in inferences being drawn in IBM's favor at trial, and that cleaning out the hard drive without permission could have also resulted in termination.  Olson responds that IBM can prove no set of facts to support its after-acquired evidence defense, and thus

39

summary judgment should be granted for Olson and the defense should be stricken.  The Court does not agree.

An employer is entitled to assert an after-acquired evidence defense if during the course of the litigation it learns of something that, had it know the information earlier, would have justified terminating the employee anyway.  <u>See Waag v. Thomas Pontiac, Buick, GMC, Inc.</u>, 930 F. Supp. 393, 408 (D. Minn. 1996) (citing <u>McKennon v. Nashville Banner Publ'g Co.</u>, 513 U.S. 352, 362-63 (1995)).  Under the after-acquired evidence doctrine, IBM must show that it would have discharged Olson had it been aware of Olson's alleged misuse of his IBM laptop.  <u>McKennon</u>, 513 U.S. at 362.  In order to invoke the doctrine, the employer must establish "that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it."  <u>Id.</u> at 362-63.  "In making such a showing, the employer bears a 'substantial burden' and must show that such a firing would have taken place as a matter of 'settled' company policy."  <u>Waag</u>, 930 F. Supp. at 408.  IBM argues that its laptop use policy was well settled and that other employees have been terminated for violating the policy by viewing pornography or by erasing information from the computer in an attempt to keep IBM from seeing the content of the computer files.  (Def. Mem. Opp. Pl. Mot. Summ. J. at 33.)

Neither party cites any information in the record regarding how many employees have violated this company policy and what disciplinary actions ensued.  Since IBM admits that discipline decisions are addressed on a case by case basis, factual disputes exist as to whether IBM would have fired Olson for the purported violation of IBM's computer use policy.

Further, it is unclear whether Olson is, in fact, responsible for the files found on the hard drive.  It is unclear how long this particular laptop was in Olson's possession and if forensic analysis had been done prior to Olson using the computer.  More practically, there is a fact question regarding who might have used the laptop.  There is conflicting testimony as to whether Olson was the sole user of the laptop or whether his family and guests had access to the computer.

Therefore, a factual dispute exists regarding whether Olson is responsible for the files found on the laptop and regarding whether IBM would actually have terminated Olson in this situation.  At this point, the Court cannot say definitively that IBM can prove no set of facts that would support this defense.  According, summary judgment is inappropriate and this part of Olson's motion is denied.

**IV.    CONCLUSION**

No issues of material fact exist regarding whether Olson is disabled under the MHRA, whether Olson was retaliated against in violation of the MHRA, or whether IBM is liable on Olson's claim of intentional infliction of emotional

distress.  However, fact issues do exist regarding whether IBM considered Olson disabled under the MHRA; whether Olson was qualified for his job, with or without accommodation; whether the accommodations Olson suggested were reasonable; whether IBM's stated reason for terminating Olson was pretextual; whether IBM retaliated against Olson for taking FMLA leave to care for his wife; and whether IBM can succeed under its after-acquired evidence defense.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

(1) Defendant's Motion for Partial Summary Judgment [Doc. No. 45] is **GRANTED IN PART and DENIED IN PART** as set forth in the body of this Order;

(2) Plaintiff's Motion for Summary Judgment [Doc. No. 51] is **DENIED IN PART and DENIED AS MOOT IN PART** as set forth in the body of this Order;

(3)     Count III of the Complaint is **DISMISSED WITH PREJUDICE**;

(4)     Count IV of the Complaint is **DISMISSED WITH PREJUDICE**; and

(5)     Plaintiff's interference claim under the FMLA is **DISMISSED WITH PREJUDICE**.

DATED: March 1, 2006

s / Michael J. Davis
Michael J. Davis
UNITED STATES DISTRICT COURT